**THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION**

NO. 4:04-CR-27-FL
NO.  4:09-CV-96-FL

| | | |
|---|---|---|
| BRIAN CONNER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

This cause comes before the Court upon Petitioner's motion under 28 U.S.C. § 2255 to

vacate, set aside, or correct sentence by a person in federal custody ("Motion to Vacate")

(DE-197).     On May 14, 2010, the Honorable Louise W. Flanagan instructed the undersigned to

conduct a evidentiary hearing and submit in memorandum form proposed evidentiary findings and

conclusions of law.   A hearing was conducted on August 19, 2010 (DE-229).   The parties have

also filed post hearing memoranda (DE's 231-232, 234-235).   Accordingly, the matter is now ripe

for adjudication.   For the following reasons, it is HEREBY RECOMMENDED that Petitioner's

Motion to Vacate (DE-197) be DENIED.

## I.   Background

Convalescent Transports, Inc. ("CTI"), which was operated by Petitioner, provided

ambulance and wheel chair transportation services to patients, many of whom were beneficiaries

of Medicare or Medicaid (DE-197, pg. 16).   The claims underlying Petitioner's conviction

concerned ambulance services to twelve patients who suffered from permanent kidney failure. CTI

1

transported these patients three times a week to and from dialysis treatment centers. All twelve patients were Medicare beneficiaries. After providing transportation, CTI sought reimbursement from Medicare (DE-197, pg. 16). In their reimbursement claims, CTI falsely represented that the patients were: 1) "bed-confined"; and 2) "stretcher-bound" (DE-197, pg. 17). In addition, the claims also falsely represented that ambulance transportation was "medically necessary" because other means of transportation would have endangered the patients' health (DE-197, pg. 17). With each claim, CTI certified that the information provided was true and accurate (DE-197, pg. 17).

Petitioner was charged in a 350-count indictment with health care fraud, conspiracy, and obstruction of justice (DE-18). Before the matter was submitted to the jury, Counts 193, 216, 228, and 336 were dismissed. *See*, Oral Orders entered on September 28 and October 6, 2005. On October 25, 2005, Petitioner was convicted on the remaining 346 counts. Specifically, a jury convicted Petitioner of violating: 1) 18 U.S.C. §§ 1347 and 1342 (health care fraud and aiding and abetting); 2) 18 U.S.C. § 371 (conspiracy to commit health care fraud); and 3) 18 U.S.C. §§ 1518 and 1342 (obstruction of a criminal investigation of health care offenses and aiding and abetting)(DE-52). He was sentenced on May 3, 2006 to 151 months of imprisonment (DE's 81-83). Furthermore, Petitioner was sentenced to: 1) three years of supervised release; 2) a special assessment of $34,600.00; 3) a fine of $175,000.00; and 4) restitution of $604,342.48. This sentence was affirmed by the Fourth Circuit on January 25, 2008 (DE's 171-172). In doing so, the Fourth Circuit specifically found that this Court did not err in relying upon the Government's statistical evidence in determining the amount of loss (DE-171, pg. 9). During trial and sentencing, Petitioner was represented by Mr. G. Christopher Kelly.

Petitioner filed his Motion to Vacate on June 3, 2009 (DE-197). The Government filed a motion for summary judgment on Petitioner's Motion to Vacate on September 21, 2009 (DE-206).

2

On March 8, 2010, the Government's motion for summary judgment was referred to the undersigned. A memorandum and recommendation ("M&R") was entered as to the Government's motion for summary judgment on March 23, 2010. In that M&R, it was recommended that the Government's motion for summary judgment be granted in part and denied in part (DE-214). It was further recommended that a hearing be conducted on Petitioner's remaining claims (DE-214). Judge Flanagan entered an order on May 14, 2010 permitting Petitioner to proceed on each of his claims (DE-217). Furthermore, the matter was recommitted to the undersigned to conduct a hearing (DE-217). The hearing on this matter was conducted on August 19, 2010 (DE-229).

## II.   Legal Standards and Analysis

### A.   28 U.S.C. § 2255

Title 28 U.S.C. § 2255 requires a petitioner asserting constitutional error to prove by a preponderance of the evidence that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law." 28 U.S.C. § 2255.

"In a §2255 proceeding, the burden is on the petitioner to prove his allegations by a preponderance of the evidence, not on the government to disprove them." Abdul-Aziz v. United States, 2008 WL 4238943, *5 (N.D.W.Va. Spt. 12, 2008) (unpublished decision) (*citing* Sutton v. United States, 2006 WL 36859, * 2 (E.D.Va. Jan. 4, 2006) (unpublished decision)); *see also*, Miller v. United States, 261 F.2d 546, 547 (4th Cir. 1958) (stating that during a "proceeding under 28 U.S.C. § 2255 . . . the burden of proof is upon petitioner to establish [his claim] by a preponderance of evidence . . .").

3

**B.   Testimony of Petitioner's witnesses**

Among the witnesses called by Petitioner during the August 19, 2010 hearing were two attorneys—Mr. Joseph Chesire and Mr. Keith Williams.   Prior to the hearing, both of these witnesses submitted affidavits (DE's 197-1, 197-2).   Both witnesses opined in their affidavits that Mr. Kelly provided ineffective assistance of counsel (Tr. 5-6).   On June 17, 2010, the undersigned instructed the parties that they "must provide a Curriculum Vitae [("CV")] and specify the area of expertise for any expert they intend to call during the hearing in this matter" (DE-224).   This requirement was further discussed during a status conference call prior the hearing in this matter (Tr. 8).   Petitioner did not provide a CV for either Mr. Chesire or Mr. Williams.

The Government objected to Mr. Chesire's and Mr. Williams' testimony.   Specifically, the Government argued that Mr. Chesire and Mr. Williams should not be considered experts pursuant to Rule 702 of the Federal Rules of Evidence.   Rather, the Government contends that Mr. Chesire and Mr. Williams should be considered lay witnesses pursuant to Rule 701 of the Federal Rule of Evidence.

Rule 701 of the Federal Rule of Evidence states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

> F.R.E. 701.

Conversely, Rule 702 of the Federal Rules of Evidence indicates that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1)

4

the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

F.R.E. 702.

Here, each attorney has offered his or her expert opinion as a lawyer as to whether Mr. Kelly rendered ineffective assistance of counsel. These legal opinions may not be accepted as lay testimony. Jackson v. United States, 638 F. Supp. 2d 514, 527 (W.D.N.C. June 19, 2009)(" Rule 701(c) was added to 'eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing ... by simply calling an expert witness in the guise of a layperson.'")(internal citations and quotations omitted). Assuming, *arguendo*, that Mr. Chesire and Mr. Williams qualify as experts, they cannot give an opinion as to a legal conclusion*; i.e.,* an opinion on an ultimate issue of law. Jackson, 638 F. Supp. 2d at 528. "[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible." United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006). *See also*, Jackson, 638 F. Supp. 2d at 528. That is precisely what each attorney has done in his or her affidavit by opining that trial counsel rendered ineffective assistance of counsel.

Regardless, Mr. Chesire and Mr. Williams were permitted to testify, and that testimony was considered by the undersigned. However, this testimony was given little weight. First, as noted above, these witnesses are not permitted to draw legal conclusions reserved for this Court. Secondly, even if they were so permitted, neither is particularly well suited to render such an opinion in this case.

Specifically, Mr. Chesire testified that he represented Petitioner on appeal and that he

5

reviewed the entire trial transcript (Tr. 13).   Much of Mr. Chesire's testimony addressed what he would have done if he had represented Petitioner at trial (Tr. 21-22, 32).   Notably, however, Mr. Chesire was not "involved in the trial preparation with Mr. Kelly or [Petitioner]" (Tr. 31, 159). Nor was Mr. Chesire "involved in any of the discussions regarding possible plea agreements with Mr. Kelly or [Petitioner]" (Tr. 32).   Indeed, Mr. Chesire was not aware whether the Government had offered Petitioner a plea to something other than the full indictment (Tr. 42).   Mr. Chesire was not involved with Mr. Kelly or Petitioner in choosing which witnesses to call at trial (Tr. 40). Likewise, Mr. Chesire was not "involved with any of the conversations between Mr. Kelly and [Petitioner] in regard to sentencing tactics and procedures" (Tr. 37).

Similarly, Mr. Williams testified that he represented a co-defendant in Petitioner's case (Tr. 106).   He had some discussions with Mr. Kelly regarding the theory of the case (Tr. 107). Ultimately, however, Mr. Williams had little personal knowledge regarding Mr. Kelly's preparation or Petitioner's willingness to plea (Tr. 115-119, 125-126, 159).   In addition,  Mr. Williams had no personal knowledge regarding the efforts Mr. Kelly undertook to prepare Kimberly Stanley as a witness (Tr. 124).

Thus, both Mr. Chesire and Mr. Williams testified that they had little personal knowledge of Mr. Kelly's efforts or of his interactions with Petitioner during the course of representation. Nor were they familiar with Mr. Kelly's plea negotiations with the Government.   Neither was present during trial.   Finally, no CV was provided for these witnesses as was instructed by the Court for any expert testimony.   For these reasons, the testimony of Mr. Chesire and Mr. Williams was given little weight with regard to whether Mr. Kelly provided ineffective assistance of counsel.   *See*, United States v. Barile, 286 F.3d 749, 760 (4th Cir. 2002) (role of the court is to distinguish opinion testimony that embraces the ultimate issue of fact from opinion that states a

6

legal conclusion, that is, specialized legal meaning); United States v. Wilson, 133 F.3d 251 (4th Cir. 1997) (district court should not have allowed expert opinion as to what the law means or how it is interpreted).

Petitioner also called Dr. Bruce Kardon to testify about the manner in which the Government had extrapolated its loss calculation. This testimony was presented as expert testimony, and a CV for Dr. Kardon was filed by Petitioner (DE 226-1). However, the Government was not provided an expert report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Pursuant to Rule 12 of the Rules Governing 2255 Proceedings, the Federal Rules of Civil Procedure were applicable to the hearing in this matter. Although Petitioner argues that the Government did not order the production of an expert report for Dr. Kardon (DE-231, pg. 7), this argument is inapposite. The relevant rule clearly states that "[u]nless otherwise . . . ordered by the court . . . [the disclosure of the identity of any expert witness] must be accompanied by a written report." F.R.Civ.P. 26. Thus, Dr. Kardon's testimony could be excluded for that reason. Moreover, the undersigned finds that Dr. Kardon's testimony has little probative weight.

The primary thrust of Dr. Kardon's testimony was that the random sample used by the Government at sentencing raised serious questions as to the integrity and validity of the sampling analysis (Tr. 49-104). Indeed, at hearing counsel argued that "I'm offering Dr. Kardon . . . to testify to the legitimacy of what was presented to the sentencing court" (Tr. 55). However, the Fourth Circuit has already considered this issue and decided it in favor of the Government. Specifically, on direct appeal the Fourth Circuit found that this Court did not err in relying upon the Government's statistical evidence in determining the amount of loss (DE-171, pg. 9). Therefore, that issue is not before the undersigned. Rather, the issue before the undersigned is whether Mr. Kelly's efforts "in attempting to investigate any available expert testimony were

reasonable" (DE-217, pg. 4). Dr. Kardon provided little—if any—insight into Mr. Kelly's efforts in representing Petitioner. Furthermore, even if Dr. Kardon's opinion regarding the Government's statistical methodology was relevant, Dr. Kardon concedes that he did not review the raw data relied upon by the Government (Tr. 52-54). Finally, Dr. Kardon did not provide the Court with an alternative calculation for the amount of loss at stake in this case (Tr. 104). Regardless, Dr. Kardon's testimony was considered, its limited probative value notwithstanding.

Finally, Petitioner did not testify during the hearing in this matter. This is a salient factor in the undersigned's recommendation to deny his Motion to Vacate. *See*, <u>Anspach v. United States</u>, 219 F. Supp. 587, 588 (W.D.N.C. July 26 1963). The burden of proof is on Petitioner in this matter. Petitioner's witnesses did not provide any testimony regarding the discussions between Mr. Kelly and Petitioner during the course of Mr. Kelly's representation. Mr. Kelly did testify as to these discussions however. Because Petitioner did not testify, Mr. Kelly's testimony is uncontroverted. As will be discussed in more detail below, Mr. Kelly's uncontroverted testimony indicates that he was not ineffective in his representation of Petitioner.

## C. Petitioner's specific claims

In his Motion to Vacate, Petitioner contends that he received ineffective assistance of counsel. To prevail on his claims of ineffective assistance, petitioner must satisfy two well-established requirements. First, he "must show that counsel's representation fell below an objective standard of reasonableness." <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984). *See also* <u>Satcher v. Pruitt</u>, 126 F.3d 561, 572 (4th Cir. 1997), *cert. denied* 522 U.S. 1010 (1997). Review of counsel's performance in this regard is highly differential. <u>Strickland</u>, 466 U.S. at 689. Second, petitioner must also demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466

8

U.S. at 694.   *See also* <u>Satcher</u>, 126 F.3d at 572.   In the context of ineffective assistance of counsel claims, the court addresses not what is prudent or appropriate, but only what is constitutionally compelled.   <u>Burger v. Kemp</u>, 483 U.S. 776, 794 (1987).   Each of Petitioner's claims shall now be considered in turn.

## 1.   Mr. Kelly's alleged failure to understand applicable law

In his first ground for relief, Petitioner asserts that Mr. Kelly provided ineffective assistance of counsel because he failed to understand the applicable law, advised Petitioner inaccurately, and advanced an untenable theory at trial.

The statutes relevant to Petitioner's conviction state the following:

> 18 U.S.C. § 371:   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
>
> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.
>
> 18 U.S.C. § 1342:   Whoever, for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title or any other unlawful business, uses or assumes, or requests to be addressed by, any fictitious, false, or assumed title, name, or address or name other than his own proper name, or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to any such fictitious, false, or assumed title, name, or address, or name other than his own proper name, shall be fined under this title or imprisoned not more than five years, or both.
>
> 18 U.S.C. § 1347:   Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
> (1) to defraud any health care benefit program; or
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

18 U.S.C. § 1518:  (a) Whoever willfully prevents, obstructs, misleads, delays or attempts to prevent, obstruct, mislead, or delay the communication of information or records relating to a violation of a Federal health care offense to a criminal investigator shall be fined under this title or imprisoned not more than 5 years, or both.
(b) As used in this section the term "criminal investigator" means any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations for prosecutions for violations of health care offenses.

More generally, Petitioner was charged with numerous counts of health care fraud under 18 U.S.C. § 1347.  As noted above, this provision makes it unlawful to knowingly and willfully defraud any health care benefit program or to obtain any money from any health care benefit program "by means of false or fraudulent pretenses, representations, or promises."  According to Petitioner, Mr. Kelly developed a flawed theory of the case and "proceeded with this approach despite concerns expressed by seasoned criminal defense lawyers who were familiar with the investigation and the evidence marshaled by the government"(DE-197, pg. 19).

Specifically, Petitioner contends that Mr. Kelly "developed his entire theory of the case on the faulty premise that, if the transports of the relevant patients were medically necessary, then the reimbursement claims submitted to Medicare were legitimate and would lead to a dismissal of the charges or an acquittal . . ." (DE 197-2, pg. 20).  In support of this claim, Petitioner observes that this defense was raised in a pretrial motion to dismiss (DE-29), which was ultimately denied (DE-38).  Mr. Kelly renewed the motion to dismiss at the close of the Government's case and again at the close of all the evidence. This Court again denied the motions, expressly concluding

10

the claims for reimbursement contained a misrepresentation as to the patients being bed-confined.

which was a false statement under section 1347(2) (DE-197, pg. 21).

In response to these allegations, Mr. Kelly stated in an affidavit:

> [Petitioner] was made aware of the pre-trial ruling of the court on our motion to dismiss the charges and that this ruling was mostly unfavorable to him . . .The statute pursued by the prosecutor stated that it was a crime to "obtain by false or fraudulent pretenses, representations, or promises, any of the money of . . .any healthcare benefit program."  Our position was that the information given to Medicare in issuance of the claim was completely truthful.  Underlying our position was the fact that the narratives sent to Medicare never contained the words "bed-confined."

(DE 207-2 pg. 2-3).

Underlying Petitioner's claim is an assertion that−despite this explanation of his strategy−Mr. Kelly fundamentally misunderstood the relevant charging statutes.   The testimony during the hearing in this matter does not support Petitioner's claim.

As noted above, opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible.   McIver, 470 F.3d at 562.   Therefore, the testimony of Petitioner's witnesses was given little weight with regard to their opinions on Mr. Kelly's effectiveness.   However, to the extent this testimony was considered, it tended to demonstrate that Mr. Kelly's representation was reasonable.

For example, Mr. Chesire testified that the motions to dismiss filed by Mr. Kelly "had been useful educational tool for [the Court] . . . and that [the Court] had limited some of the Government's proof as a result of [Mr. Kelly's efforts]" (Tr. 16).   Even after the Government's proof was limited, Mr. Chesire opined that "the Government had a very powerful case" (Tr. 22, 32, 39).   Likewise, with regard to Petitioner's willingness to plead guilty, Mr. Chesire stated that Petitioner "did not want to accept responsibility for what he did" (Tr. 34-35).   Mr. Chesire also

conceded that Petitioner's unwillingness to plead guilty "put Mr. Kelly in a difficult situation . . ." (Tr. 35).

Similarly, Mr. Williams generally described the Government's evidence as strong (Tr. 120). Specifically, Mr. Williams testified that "the evidence against [Petitioner] was stronger than the evidence against my client" (Tr. 121). Mr. Williams also conducted his own independent research into the theory Mr. Kelly used at trial (Tr. 108). For example, Mr. Williams consulted with other lawyers about the validity of this defense (Tr. 112). Although the response was mixed, some attorneys indicated that the theory was feasible (Tr. 113). Ultimately, Mr. Williams determined that "[a]s a legal matter we could raise this legal defense" (Tr. 121). Mr. Williams also stated that " . . . I encouraged [Mr. Kelly] . . . if we are forced to a trial as a last resort, we could raise that sort of thing . . ." (Tr. 112). Indeed, Mr. Williams asserted that he likely would have employed a similar defense if his client had gone to trial[1] (Tr. 122).

In addition, the Government's evidence strongly indicates that Mr. Kelly understood the controlling law. Ms. Yvonne Watford-McKinney was the chief prosecutor during Petitioner's trial (Tr. 128). She described Mr. Kelly's efforts in the following manner:

> . . . there were literally hundreds and hundreds of thousands of claims and patient records and millions of pages of documents in this case. This was no fly-by-night case. This case took five years to investigate . . .
>
> . . . We had a lot of contentions between us and among us with the agents and myself and my second chair, etcetera, and it was clear that he was on top of it . . . I do remember that it appeared to me that he knew what he was doing. He was a recognized expert and several times during the course of the proceedings, you know, we acknowledged that.

(Tr. 133-134).

---

1 Petitioner argues in his post-hearing memorandum that "two experienced and respected practitioners" testified that Mr. Kelly's trial strategy was ineffective on its face (DE-235, pg. 1, 3). This assertion ignores Mr. Williams' testimony that he may have used Mr. Kelly's strategy had his client gone to trial.

Finally, Mr. Kelly testified that:

> I've been practicing for 12 years, for the last 10 or more I've been focused entirely on health care, mainly regulatory health care reimbursement issues and for about, I'd say, most of that about the last 9 have been focused on almost nothing but regulatory ambulance reimbursement and other regulatory issues . . .
>
>  . . . I write the legal advice column, for lack of a better word, for EMS Magazine. I sit on the editorial advisory board for the magazine and professor at Virginia College where I teach legal aspects of health care administration. I lecture extensively across most of the eastern region of the country, and this year I'm doing 10 or so lectures. I speak usually at associational meetings for [Emergency Medical Services] EMS associations . . .
>
>  . . .when we did our initial motion to dismiss . . .one of the goals of that motion was to get evidence limited and with all the concerns about evidence about patients walking to the ambulance or riding in front of an ambulance, there's not a single mention of that at trial because all that got removed in pretrial motions . . .
>
>  . . . we never envisioned the case getting dismissed, but I had to do a couple things. I had to test the water and see what the judge -- how she reacted to some of the arguments. I had to set up, especially the issue of bed confinement . . .
>
>  . . . And so, I mean, I knew some of the arguments we would lose, but some of them we had to win. Some of them we had to set up for later and others, such as the trying to get out the conduct from the prior subpoenas, I mean, that was -- my hope was that we could get that removed . . .
>
>  . . . Because when I told -- there were three different parts of this. There was some it I had to win. Some of it I had to lose to say, hey, you are going to be facing these issues, and some of it that -- yeah. I was hoping to educate the judge. And as far as that, that was something that I was really hoping it would be more educational to the judge and specifically to set up issues for appeal.

(Tr. 150-158, 169).

"Because it may be tempting to find an unsuccessful trial strategy to be unreasonable, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of

13

reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Carter v. Lee, 283 F.3d 240, 249 (4th Cir. 2002) (*quoting* Strickland, 466 U.S. at 689). The reasonableness of a lawyer's trial performance must be "evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of reasonableness is highly deferential." Kimmelman v. Morrison, 477 U.S. 365, 381. Using this deferential standard, the record indicates that Mr. Kelly was well prepared and that his trial strategy was sound. Therefore, the undersigned finds that the defense employed by Mr. Kelly at trial was reasonable under the circumstances.

Accordingly, it is HEREBY RECOMMENDED that Petitioner's Motion to Vacate be DENIED with regard to Petitioner's first claim of relief.

## 2. Mr. Kelly's alleged failure to pursue a plea agreement with Government

Petitioner also argues that Mr. Kelly rendered constitutionally ineffective assistance when he failed to pursue a resolution of this matter through a plea agreement with the Government (DE-197, pg. 24). "Within the Fourth Circuit, defense counsel's duties as to plea negotiations are to: 1) notify the client of a plea offer; 2) advise the client of the option to proceed to trial; 3) present the client with the probable outcomes of both the guilt and sentencing phases of each alternative; and 4) permit the client to make the ultimate decision." Rivers v. United States, 2010 WL 3063215, * 8 (E.D.N.C. Aug. 3, 2010).

First, the validity of this argument hinges on Petitioner's contention that Mr. Kelly failed to understand the applicable law (DE-235, pg. 5). However, the undersigned has already concluded that Mr. Kelly did in fact have a firm grasp on the relevant law. Thus, this claim could be dismissed on that ground alone.

14

Moreover, Petitioner argues that Mr. Kelly made no serious effort to negotiate a possible plea agreement with the Government.   However, the testimony demonstrated the contrary.   First, Ms. Watford-McKinney stated that:

> I remember speaking with Mr. Kelly, and he asked if I would provide him with some reports of some of the witnesses so that he could take them back to his client in an effort to convince his client that it might be in his best interest to enter a plea. And so we did that. We provided him with some additional information.   I have no doubt that he shared it with his client, but the response was after some time that Brian Conner wanted to go to trial. . . .
>
> . . . I'm sure that we talked about a plea . . .
>
> (Tr. 132, 137).

Ultimately, Ms. Watford-McKinney asserted that Mr. Kelly told her that Petitioner wanted to go to trial (Tr. 141).

Mr. Kelly also testified that Petitioner was not interested in a plea.   Specifically:

> We looked at the sentencing guidelines, and we talked about going to the Government, but Brian was never interested in meeting with them . . .He did not want to plead guilty . . .
>
> . . . I think that the best conversation we had about pleading was when I had had one of the phone calls with Ms. McKinney, and we had discussed some specifics, and her statement, and I still remember it six years later was, 'nobody needs to go to jail here' . . .And [Petitioner] still, even with that, . . . [Petitioner] wasn't inclined . . .
>
> . . . And within -- literally, within less than half an hour of that phone call, the civil side US attorney called me and said, hey, I heard you're talking about a plea bargain, and I just want to let you know that we've done an asset search . . .
>
> . . . I went back and told [Petitioner] and called him back and told him that and that really turned the tide . . . He said . . . they're going to take everything I have . . .what about my employees . . .?
>
> (Tr. 159-160, 170-172).

Moreover, the undersigned reiterates that because Petitioner did not testify, Mr. Kelly's testimony with regard to plea negotiations between Petitioner and the Government is uncontroverted.

Thus, the record indicates that Mr. Kelly understood the relevant law and advised Petitioner concerning the available alternatives. Based on this information, Petitioner determined that he did not want to plead guilty. Therefore, Petitioner essentially argues that Mr. Kelly was ineffective in failing to persuade Petitioner to plead guilty. This argument does not comport with the law of this Circuit. Specifically, "various [s]tandards place[] . . . upon counsel an affirmative duty to avoid exerting 'undue influence on the accused's decision' and to 'ensure that the decision ... is ultimately made by the defendant.'" Jones v. Murray, 947 F.2d 1106, 1111 (4th Cir. 1991)(*quoting* American Bar Association Standards for Criminal Justice, Standards 4-5.1(b) & 14-3.2(b)).

Accordingly, it is HEREBY RECOMMENDED that Petitioner's Motion to Vacate be DENIED with regard to Petitioner's second claim of relief.

### 3. Mr. Kelly's alleged failure to properly prepare a witness

Petitioner also contends that Mr. Kelly "did not prepare [a] witness properly and allowed her to give testimony that irreparably damaged both his own claim in opening statement and the theory upon which the defense was founded" (DE 197-3, pg. 6). As an initial matter, the undersigned notes that such a claim is precisely the type of tactical second guessing that is generally disfavored under the Strickland standard. Strickland, 466 U.S. at 689-90. *See also*, United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004)( decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which must be afforded "enormous deference").

16

Specifically, Petitioner asserts that as part of the defense evidence, Mr. Kelly called Kimberly Stanley, who worked for a company that primarily provided billing services for ambulance providers (DE-197, pg. 28). Ms. Stanley had extensive experience with and knowledge about Medicare regulations and billing requirements (DE-197, pg. 28). Mr. Kelly forecasted Ms. Stanley's testimony in his opening statement, which he reserved to the beginning of the defense evidence (DE-197, pg. 28). According to Mr. Kelly, it would be established through Ms. Stanley's testimony that "Convalescent didn't claim these patients were bed-confined" (DE-197, pg. 28). Ms. Stanley then provided extensive testimony about Medicare billing procedures especially as it related to ambulance providers (DE-197, pg. 28). In fact, on direct examination, Mr. Stanley testified the claims in question concerned patients who were "stretcher-bound" (DE-197, pg. 29). However, on cross-examination Ms. Stanley disclosed she had met with government agents about this investigation. The agents provided her with additional medical records about each of the patients at issue. Based on the full medical information, Ms. Stanley concluded "the patients were not stretcher-bound." (DE-197, pg. 29). Moreover, Ms. Stanley also acknowledged she had reviewed the reimbursement claims submitted by Petitioner for Medicare reimbursement (DE-197, pg. 29). After conducting this review, Ms. Stanley concluded that the defendants had answered "yes" to the question of whether the patient was bed-confined "in every case" (DE-197, pg. 29).

Therefore, Petitioner argues that Ms. Stanley's testimony either : 1) indicates that Mr. Kelly did not know she would make these admissions because he had failed to adequately interview her prior to trial; or 2) further emphasizes that Mr. Kelly seriously misunderstood the Government's theory of the case and the controlling legal precedents (DE-197, pg. 29-30).

Again, the validity of this argument hinges in part upon Petitioner's contention that Mr.

17

Kelly failed to understand the applicable law. However, the undersigned has already concluded he did.

Furthermore, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697. In cases where "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice," the Supreme Court instructed district courts to follow that course. *Id.* The Court finds that Petitioner's conviction was supported by ample evidence other than the testimony Ms. Stanley provided on cross-examination. Therefore, Mr. Kelly's decision to call Mr. Stanley as a witness—even if it is assumed to be unreasonable—does not amount to prejudice under Strickland.

Regardless, the evidence does not support Petitioner's argument that the decision to call Ms. Stanley was unreasonable. First, Ms. Watford-McKinney testified as follows:

> . . . [W]e knew very, very early on that Mr. Conner had utilized Kim Stanley's company at some point for billing purposes. And as we were investigating, as we were interviewing people to be prepared as witnesses at trial, we interviewed Kim Stanley. I think the agents had interviewed her prior to my even becoming aware of her. Certainly the agents had interviewed one of the other representatives of her company because we had anticipated calling that person before the Grand Jury . . .

> . . .Anyway, we went out to see Kim Stanley or she came to us, I don't quite remember that, and in the course of asking her questions, she let us know that she had already spoken with Mr. Kelly. I think at some point we thought about using Kim Stanley as an expert. Chris Kelly beat us to it. We found out essentially what they had discussed, and we said, well, did you look at patient records? She said she had not. So we set up a time where she came -- I think she came to our location, and she reviewed patient records for our patients, and as she reviewed those records we asked her, did this person qualify for ambulance transport, and she said no, and we just kept going on and on and on.

> Well, we had no obligation to share that testimony with Mr. Kelly so we didn't. It's part of, you know, what a lawyer does. And so we waited until

she testified on direct from Mr. Kelly and then on cross examine, we went over that testimony and then we asked her, specifically, did you review the medical records for this patient, and she said yes. And we asked her, after reviewing the medical records and reviewing the narrative and the trip ticket and the electronic claim, did this patient qualify for ambulance transport, and she said no. Was this patient bed confined, no, on down the line . . .

. . .She spent quite some time, by her admission, with Mr. Kelly . . .

(Tr. 134-136).

Ms. Watford-McKinney's testimony corroborates Mr. Kelly's account:

we've had the testimony from Mr. Cheshire regarding Kim Stanley's testimony, and I'll be quite frank, I see things different than the way he depicted . . .So the Government's own expert acknowledged that what's said in the  narrative is true, and our expert, Ms. Stanley, I think they kind of down   played her testimony a little bit, but what she did was she said, look, all we  saw was what was in that narrative. We didn't see these checked boxes. So, yeah they made an issue out of saying, well, we showed her these other records. These were records that Convalescent didn't have access to at the time they were   making these transport decisions.  They showed her other records and said, would you have paid the claims, and she said no. But at the end of the day, what Convalescent said, according to her testimony, was not  false.   They     gave     accurate information. Was it sufficient to pay the claims? Maybe not. But as far as a false statement, that's one thing I do agree with Mr. Cheshire, he said you had to make a false statement that the Government relied on in paying the claims. Well, according to our expert, the Government did not rely on those bed confined statements in paying the claims . . .

. . . [Ms. Stanley] was the ambulance policy liaison for the entire timeframe of any claim in the sample. She was the Government. She was Medicare for all practical purposes for the timeframe  in the indictment. And she was going to explain to us, what did Medicare actually see. What information did we rely on. And under the statute, I think that is a key issue, what information did the Government actually rely on, was it false and according to Government's medical experts and according to my medical experts, it wasn't . . .

 . . . As Ms. McKinney pointed out, she didn't tell me that they had interviewed Ms. Stanley. She didn't tell me that they had provided Ms. Stanley with medical records that my folks didn't even have access to. She didn't try to say an interview statement like with a lot of other witnesses for

that. And I met with Ms. Stanley several times after she met with the Government including meeting with her several hours the night before she testified, and she never mentioned to me that she had been approached by the Government, reviewed documents for the Government, nor gave any kind of opinions to the Government. . . .

I mean, I think to say that her testimony was somehow devastating is -- it may look like that when you're reading the print on the page of the transcript, but at trial, it was not some bomb shell moment. I mean, she was asked that if in hindsight you 1 were given a bunch of additional medical records and then asked, okay, would you pay these claims, she said no. . . .

 . . . I think, you know, that's the worse thing you could say about Kim Stanley's testimony is that if she'd been doing a post pay audit in a civil recoupment type thing, she would have said, well, now that I've got all these other medical records, I wouldn't pay these claims. And I asked her specifically on the stand, do you have any information that my clients had these records when they were making your decisions, and she said no.

(Tr. 160-164).

Tellingly, Ms. Stanley did not inform Mr. Kelly that she had met with the Government or that her testimony would change based on the time she spent with the Government (Tr. 176).

To reiterate, the Forth Circuit has stated that the decision whether to call a defense witness is entitled to "enormous deference" Terry, 366 F.3d at 317. Petitioner has failed to meet his burden with regard to this claim. On the contrary, Mr. Kelly demonstrated that he had valid strategic reasons for calling Ms. Stanley as a witness, and that he spent significant time preparing her. In addition, he was unaware that the Government had also interviewed Ms. Stanley. Finally, even if the performance prong of Strickland is met with regard to this claim, Petitioner has failed to adequately demonstrate that he was prejudiced by Mr. Kelly's decision to call Ms. Stanley as a witness.

Accordingly, it is HEREBY RECOMMENDED that Petitioner's Motion to Vacate be DENIED with regard to Petitioner's third claim of relief.

20

## 4.  Counsel's alleged errors at sentencing

Finally, Petitioner alleges that Mr. Kelly rendered ineffective assistance of counsel by:   1) failing to object to the Government's calculation of the loss figure involved in this case; and 2) failing to advocate for the application of a "special rule"[2] applicable to the loss calculation.

As noted above, on direct appeal the Fourth Circuit specifically found that this Court did not err in relying upon the Government's statistical evidence in determining the amount of loss (DE-171, pg. 9).   Indeed, the Fourth Circuit noted that "in determining the amount of loss for the purpose of calculating the offense level in fraud cases, the court need only make a reasonable estimate of the loss [because] . . .[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence . . .[f]or this reason, the court's loss determination is entitled to appropriate deference."   (DE-171, pg. 9)(internal quotations omitted). Likewise, the Fourth Circuit also stated that "[e]xtrapolation is an acceptable method to use in making a reasonable estimate of the amount of loss under the sentencing guidelines."(DE-171, pg. 11)(*citing* United States v. Pierce, 409 F.3d 228, 234 (4th Cir. 2005)).   Thus, the issue before the undersigned is not the accuracy of the Government's statistical evidence but rather whether Mr. Kelly's efforts at sentencing were reasonable.   The testimony at the hearing in this matter indicates that they were.   *See*, Loveridge v. United States, 2009 WL 290192, * 10 (N.D.W.Va. February 5, 2009)(Calling expert at sentencing not required when counsel was "otherwise prepared and provided . . . reasonable assistance at [sentencing] hearing").

---

2 A special rule of Section 2B1.1 of the United States Sentencing Guidelines applies to the determination of the amount of loss in cases involving Government benefits.   Specifically, "[i]n a case involving government benefits (*e.g.*, grants, loans. entitlement program payments) loss shall be considered to be not less than the value of the benefits obtained by the unintended recipients or diverted to unintended uses, as the case may be." U.S.S.G. § 2B 1.1 (a)(2), Application Note 3(F)(ii).   Thus, Petitioner argues that the calculation of loss for sentencing is not merely the amount of money unlawfully taken. Rather, Petitioner contends that loss should be calculated as the amount of benefits received above what would have received but for the false statements.

Moreover, with regard to prejudice, applying <u>Strickland</u> to ineffective an assistance at sentencing claim requires that "sentence would have been more lenient" absent counsel's errors. <u>United States v. Mayfield</u>, 320 Fed. Appx. 190, 191 (4th Cir. 2009)(unpublished opinion)(*citing* <u>Royal v. Taylor</u>, 188 F.3d 239, 248-49 (4th Cir. 1999). The record clearly indicates that Petitioner was not prejudiced by Mr. Kelly's representation at sentencing.

Mr. Kelly described his sentencing strategy as follows:

> . . . the presentence report was lengthy, and we had gone over that in great detail about our objections to the presentence and what we thought was more of a conclusion than a fact and our objections to that and we discussed the amount of loss issues. . . .

> . . . I think we made an argument for a specific reduction, and then we had argued against some of the presentence report. We had made it a point to make . . . [Petitioner's] medical condition an issue because we were hoping -- or hoping that that would be considered. Certainly, we were hoping it would be considered in his placement, and we were hoping that it would 1 be considered with his sentence as well . . . I recall challenging the sampling, specifically the reduction when he took out those 65 claims in discussing whether or not that would kill the validity of the sample since you reduced the sample size . . .

> . . .I think [we] made some very good challenges to the validity of the sample . . .

> (Tr. 165-167, 174).

Mr. Kelly's testimony is further reinforced by the sentencing transcript in this matter. For example, at Petitioner's sentencing this Court made the following findings:

> The amount of the loss the Court finds in this case is $3,613,165. I arrived at this figure by utilizing the 95% confidence level of the statistical sampling submitted by the government, which excludes calculation of the 65 claims for which no records were found. From this figure of $3,640,781 I've deducted $27,615 . . . I used the figure -- and I think it's important to be very clear here -- **I used the figure excluding the claims, because I've found credence with defendants' arguments** that sufficient diligence had not been applied to that exercise over a period a limited period of time if I

22

understand, two agents -- to scrutinize 200 boxes to find all of the claims which had been identified in that statistical sampling process . . .

 . . . inasmuch as the range exceeds 24 months, I've imposed a range at the top end of the guidelines in consideration of the very conservative loss figure and the fact that the patients' deprivation of dignity was not factored into the guideline range. **I've heard a great deal about the services provided by the defendant,** and, no doubt, there were many people who were given kindness by the defendant. . . .

. . .All of this considered, as well as, again, I turn back to a very conservative loss calculation really at every turn.  **While subscribing and agreeing that the statistics are correct and properly applied, every time I've given the defendant the benefit**.
(DE's  225-2 & 225-3, emphasis added).

The Court's remarks belie Petitioner's contention that Mr. Kelly did not provide zealous and effective representation at sentencing.  According to the Mr. Kelly's testimony, the initial loss calculation was over \$6,000,000[3] (Tr. 175).  Mr. Kelly's efforts were at least partially responsible for significantly reducing that loss calculation.  Therefore, Petitioner in fact received a more lenient sentence based on Mr. Kelly's efforts.

In his post-hearing memorandum, Petitioner cites two cases to support the contention that Mr. Kelly was ineffective during sentencing:  Rompilla v. Beard, 545 U.S. 374 (2005) and Washington v. Murray, 952 F.2d 1472 (4th Cir. 1991).  Both cases are distinguishable.

First, Rompilla addressed "norms of adequate investigation in preparing for the sentencing phase of a **capital** trial when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation."  Rompilla, 545 U.S. at 381 (emphasis added).  Moreover, even in the context of a capital crime, the Supreme Court observed that:

In judging the defense's investigation, as in applying Strickland generally, hindsight is discounted by pegging adequacy to "counsel's perspective at

---

3 Petitioner concedes that the Government offered evidence that CTI received \$6,822,690.54 from Medicare and Medicaid (DE-235, pg. 6).

the time" investigative decisions are made, 466 U.S., at 689, 104 S.Ct. 2052, and by giving a "heavy measure of deference to counsel's judgments," *id.*, at 691, 104 S.Ct. 2052.
<u>Beard</u>, 545 U.S. at 381.

Regardless, the holding in <u>Rompilla</u> clearly hinged upon one crucial factor: "the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction." *Id.* at 383. Thus, <u>Rompilla</u> does not support Petitioner's broad assertion that "the government has yet to come to grips with numerous[4] cases that find ineffective assistance where trial counsel fails to investigate available expert testimony" (DE-235, pg. 7).

Likewise, Petitioner cites <u>Washington</u> for the proposition that Mr. Kelly's "failure to obtain [an] expert was ineffective" (DE-235, pg. 7). It is difficult to discern how counsel reaches this conclusion because the Court is not provided with a pinpoint citation to the portion of <u>Washington</u> which would support this proposition. Regardless, <u>Washington</u> also reviews a death penalty case. In <u>Washington</u>, it was alleged that "trial counsel had failed to develop and present to the jury the results of certain allegedly exculpatory forensic evidence . . .[ and s]pecifically failed to appreciate the significance of, and hence to introduce at trial, the results of exculpatory laboratory tests . . ." <u>Washington</u>, 952 F.2d at 1476. With regard to that claim, the Fourth Circuit remanded the matter for resolution by an evidentiary hearing. Thus, that portion of <u>Washington</u> does not support the sweeping generalization that "failure to obtain expert was ineffective." Other bases for ineffectiveness were also proffered in <u>Washington</u>. However, the <u>Washington</u> Court determined that none of the other proffered bases supported an ineffectiveness claim. Indeed, in doing so the <u>Washington</u> Court stated that "later-obtained experts may disagree

---

4 Petitioner only cites two of these "numerous" cases (DE-235, pg. 7).

with the conclusions of the . . .[Government's experts] . . ., but this after-the-fact disagreement cannot be taken to demonstrate the critical point that counsel's failure to have suspected the possibility of a basis for expert disagreement was professionally deficient performance" Washington, 952 F.2d at 1482.

In short, neither Rompilla nor Washington bolster Petitioner's argument.   Moreover, even if those cases are accepted to stand for the proposition for which Petitioner cites them, Petitioner has still failed to meet his burden to demonstrate that he was prejudiced by Mr. Kelly's allegedly deficient performance.

Accordingly, it is HEREBY RECOMMENDED that Petitioner's Motion to Vacate be DENIED with regard to Petitioner's fourth and fifth claims of relief.

## III.   Conclusion

Based on the foregoing analysis, it is HEREBY RECOMMENDED that Petitioner's Motion to Vacate (DE-197) be   DENIED in all respects.

SO RECOMMENDED in Chambers at Raleigh, North Carolina on Wednesday, September 15, 2010.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE