IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:04-CR-27-FL-2
NO. 4:09-CV-96-FL

| | | |
|---|---|---|
| BRIAN CONNER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

This matter is before the court on petitioner's motion to vacate judgment or set aside sentence pursuant to 28 U.S.C. § 2255 (DE # 197). Pursuant to 28 U.S.C. § 636(b)(1) and Rule 8(b) of the Rules Governing Section 2255 Proceedings, United States Magistrate Judge William A. Webb conducted an evidentiary hearing and issued a memorandum and recommendation ("M&R") containing proposed evidentiary findings and conclusions of law (DE # 236). The magistrate judge recommends denying petitioner's § 2255 motion. Petitioner timely objected, and the government did not respond. In this posture, the issues raised now are ripe for ruling.

## BACKGROUND

On October 25, 2005, after a thirteen-day trial, petitioner was convicted by a jury of three hundred and forty-six (346) counts of health care fraud, conspiracy to commit health care fraud, and obstruction of the criminal investigation of health care fraud. On May 3, 2006, the court sentenced petitioner to a term of one hundred and fifty-one (151) months imprisonment.

At petitioner's two-day sentencing hearing, the court heard detailed testimony from the government regarding the amount of loss attributable to petitioner's fraud for purposes of setting a base offense level in determining the appropriate guidelines range. See U.S.S.G. § 2B1.1(b)(1). The government first demonstrated that petitioner's company, Convalescent Transports, Inc. ("CTI"), had received $6,822,690.54 in reimbursements on thousands of potentially fraudulent Medicare claims. A medical fraud investigator testified that only fourteen (14) claims out of a randomly generated sample of two hundred and thirty (230) claims were justified by medical necessity. Extrapolating this data, a statistician testified that petitioner was responsible for a total loss of $6,330,298.00.

Petitioner's trial counsel, G. Christopher Kelly ("Kelly"), challenged the government's extrapolation methodology. Specifically, he challenged sixty-five (65) claims which had been disqualified by the medical fraud investigator on the ground that no medical documentation existed. The court agreed with Kelly that the government had not met its burden of proof that these sixty-five (65) claims were not medically necessary in that medical documentation demonstrating medical necessity could have simply been lost after seizure of CTI's records. Accordingly, the court determined that these claims should be treated as legitimate claims. When these sixty-five (65) now-legitimate claims were taken into consideration, the final loss figure determined by the court using extrapolation was $3,613,165.00.[1]

On appeal, the Fourth Circuit upheld the court's use of the government's evidence and the extrapolation methodology employed, and affirmed petitioner's sentence. See United States v. Conner, 262 F. App'x 515, 518-19 (4th Cir.) (unpublished), cert denied 128 S. Ct. 2889 (2008).

---

[1] The court's recalculation of the loss attributable to petitioner had no effect on his advisory guidelines range because an individual receives an 18-level increase in his base offense level for any loss between $2.5 million and $7 million. See U.S.S.G. § 2B1.1(b)(1)(J) (2005). Petitioner's sentence fell within the calculated guidelines range.

2

Petitioner filed the instant motion pursuant to 28 U.S.C. § 2255 on June 3, 2009, alleging that his counsel was ineffective during both trial and sentencing. Specifically, petitioner argues that Kelly was ineffective in (1) failing to understand the applicable law, advising petitioner inaccurately on the law, and advancing an untenable legal theory at trial; (2) failing to pursue a plea agreement with the government; (3) presenting a key witness who provided unfavorable testimony; (4) failing to offer expert testimony at sentencing to counter the government's statistical evidence; and (5) failing to advocate for application of U.S.S.G. § 2B1.1 cmt. n. 3(F)(ii) at sentencing.

The government moved for summary judgment on September 21, 2009. The court, with benefit of the magistrate judge's recommendation, denied the government's motion on May 14, 2010. The matter was recommitted to the magistrate judge to conduct further proceedings and to submit proposed findings of fact and conclusions of law. A hearing was held on August 19, 2010, at which a number of witnesses testified. On September 21, 2010, the magistrate judge entered his M&R, recommending that the court deny each of the five claims for relief asserted by petitioner. On October 1, 2010, petitioner objected to the magistrate judge's recommendation with regard only to the fourth and fifth claims for relief, asserting ineffective assistance of counsel at sentencing. The government did not respond.

## DISCUSSION

A.   Standard of Review

In his § 2255 motion, petitioner contends that his counsel was ineffective. To sustain this claim, petitioner must demonstrate that (1) his counsel's performance was deficient and (2) that deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The first prong is met only where counsel's performance falls "below an objective standard of

3

Case 4:04-cr-00027-FL   Document 238   Filed 11/01/10   Page 3 of 14

reasonableness." Id. at 688. "Review of counsel's performance is 'highly deferential[,]'" and the court operates under the "strong presumption that [counsel's] performance was within the extremely wide range of professionally competent assistance." Baker v. Corcoran, 220 F.3d 276, 293 (4th Cir. 2000) (citation omitted). The second prong of Strickland's ineffective assistance test is met where there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. To demonstrate prejudice at sentencing, petitioner must show a reasonable probability that he would have received a more lenient sentence. See Glover v. United States, 531 U.S. 198, 202-04 (2001).[2]

The court may "designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit . . . proposed findings of fact and recommendations for the disposition . . . of applications for post-trial relief made by individuals convicted of criminal offenses." 28 U.S.C. § 636(b)(1)(B); see also Rule 8(b) of the Rules Governing Section 2255 Proceedings. The court reviews *de novo* those portions of the magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). Absent a specific and timely filed objection, the court reviews for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

---

[2] An individual has a right to effective assistance of counsel during a noncapital sentencing hearing. See United States v. Burkley, 511 F.2d 47, 51 (4th Cir. 1975). Although the Court in Strickland left open "the role of counsel in an ordinary sentencing, which may . . . require a different approach to the definition of constitutionally effective assistance," Strickland, 466 U.S. at 686, the courts of appeal have generally applied the same two-step Strickland test to noncapital sentencing hearings. See, e.g., United States v. Seyfert, 67 F.3d 544, 547 (5th Cir.1995); Carsetti v. Maine, 932 F.2d 1007, 1012-14 (1st Cir. 1991); United States v. Stevens, 851 F.2d 140, 145 (6th Cir. 1988); see also United States v. Russell, 34 F. App'x 927, 927-28 (4th Cir. 2002) (unpublished) (per curiam) (applying Strickland where counsel failed to object to the calculation of a base offense level at sentencing).

4

B.  Analysis

   1.  Petitioner's First, Second, and Third Claims for Relief

The magistrate judge recommends denying relief on plaintiff's first three claims, each of which challenge an aspect of Kelly's performance at trial. Petitioner does not object to the magistrate judge's determination of these issues, and as such they are reviewed for clear error. Diamond, 416 F.3d at 315. After a careful and considered review of the relevant portion of the M&R, the court is satisfied that the magistrate judge correctly applied the appropriate legal principles to the facts presented.[3] Accordingly, the court adopts as its own those portions of the M&R pertaining to the alleged trial errors, and denies relief on the first three claims presented.

   2.  Petitioner's Fourth Claim for Relief

In his fourth claim for relief, petitioner alleges that Kelly was ineffective in failing to challenge with expert testimony the statistical and random sampling methodology used by the government at sentencing in calculating the amount of loss. The magistrate judge recommended denying this claim, noting that the Fourth Circuit upheld this court's adoption of the government's methodology and that Kelly's efforts in attacking the methodology were reasonable under the circumstances. The magistrate judge also concluded that petitioner had not demonstrated any prejudice where Kelly was successful in substantially reducing the amount of loss for which

---

[3] Specifically, the magistrate judge found that Kelly understood the applicable law and that the theory he presented at trial was a reasonable one under the circumstances presented. See Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (noting that the reasonableness of counsel's trial strategy is to be evaluated from counsel's perspective and "in light of all the circumstances"). The magistrate judge further found that Kelly acted properly with respect to plea negotiations, correctly instructing petitioner on the law and the consequences of pleading guilty as opposed to going to trial, and abided by petitioner's decision based on that advice. See Jones v. Murray, 947 F.2d 1106, 1111 (4th Cir. 1991) (noting that counsel should advise a client of alternatives but should not unduly pressure client to accept or reject a plea). Finally, the magistrate judge found no error in Kelly's decision to call Kimberly Stanley as a witness. See United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004) ("[T]he decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks . . . ."). Each of these conclusions is supported by the record evidence.

5

petitioner was held accountable. Petitioner objects to the magistrate judge's analysis, contending that the magistrate judge misunderstood petitioner's claim and improperly rejected precedent relating to the duty to investigate in capital sentencing proceedings, which precedent petitioner contends may be fairly read to impose a similar duty in noncapital sentencing proceedings.

Although the Strickland test applies in noncapital sentencing proceedings as well as capital sentencing proceedings, see Russell, 34 F. App'x at 927-28, "objectively reasonable" conduct at the former may be different than "objectively reasonable" conduct at the latter. As such, the court agrees with the magistrate judge that any discussion of, for example, the ineffectiveness in failing to present expert mental health testimony to mitigate against a sentence of death is of little help in determining the reasonableness of Kelly's failure to present an expert in statistics to challenge the government's calculation of loss.[4] However, relevant standards promulgated by the American Bar Associations (ABA) suggest that counsel in a noncapital sentencing proceeding has the duty to (1) conduct a prompt investigation of circumstances and facts relevant to sentencing, (2) present to the court any ground leading to a favorable disposition at sentencing, and (3) supplement or challenge information provided in any presentence investigation report. See ABA Criminal Justice Standards 4-4.1(a) and 4-8.1(b).[5] Whether or not it was objectively unreasonable for counsel to use expert testimony to

---

[4] As petitioner points out, objectively reasonable counsel in a capital sentencing proceeding will investigate and present mitigating evidence, including as a general matter expert testimony regarding the defendant's mental condition. See generally Rompilla v. Beard, 545 U.S. 374 (2005); Gray v. Branker, 529 F.3d 220 (4th Cir. 2008). But as the magistrate judge noted, the need for such investigation in large part appears to be dictated by the unique nature of counsel's role in a capital case "to counter the State's evidence of aggravated culpability with evidence in mitigation." Rompilla, 545 U.S. at 380-81; see also Gray, 529 F.3d at 228-29; McNeill v. Polk, 476 F.3d 206, 228 (4th Cir. 2007) (Gregory, J., concurring in part and dissenting in part) ("The consideration of mitigation evidence in a capital sentencing is unique in criminal procedure.").

[5] The court may use ABA standards as a guide to determining "what is reasonable." See Wiggins v. Smith, 539 U.S. 510, 524 (2003). However, these standards are not "dispositive in and of themselves." See Meyer v. Branker, 506 F.3d 358, 372 (4th Cir. 2007).

6

meet these obligations requires a deferential inquiry undertaken "from counsel's perspective at the time of the alleged error and in light of all the circumstances." See Kimmelman v. Morrison, 477 U.S. 365, 381 (1986).

Before turning to the nature of the specific error alleged by petitioner, it is worth summarizing the actions actually taken by Kelly relating to sentencing. According to his hearing testimony before the magistrate judge, Kelly reviewed the presentence report ("PSR") prepared by the Probation Office with petitioner, going over potential objections in great detail and discussing the calculation of loss. Kelly made a number of objections to the PSR on petitioner's behalf, and the court notes that he zealously and effectively advocated on petitioner's behalf at sentencing, particularly relating to the government's statistical sampling and its proposal to "deny" for loss purposes sixty-five (65) claims for which no medical documentation existed. This objection resulted in a favorable ruling that reduced the loss calculation by almost $3 million.

Petitioner argues that these efforts were objectively unreasonable because Kelly did not use a statistical expert to counter the government's sampling methodology. Specifically, petitioner provided evidence from two experts in the field of statistics who contended that the government's sampling methodology was seriously flawed and yielded inaccurate data, and testimony from two attorneys familiar with this case who stated that they would have employed this expert testimony to challenge the loss figure offered by the government.[6] Petitioner's experts relied on reports generated by the government's expert at sentencing, but did not have access to the data used by her in calculating loss, and did not perform their own sampling.

---

[6] The magistrate judge noted that much of the testimony of petitioner's witnesses could be excluded on one or more grounds. However, the magistrate judge considered all of the testimony offered by these individuals, and the court will as well where no party has objected.

The court cannot agree with petitioner. Although expert testimony may well have strengthened Kelly's attack on the government's evidence and statistical sampling, the failure to call such an expert under the circumstances in this case did not fall below the "extremely wide range of professionally competent assistance." See Gilbert v. Moore, 134 F.3d 642, 654 (4th Cir. 1998) (en banc). The court heard testimony over two days regarding the government's sampling evidence, and Kelly vigorously and effectively challenged many aspects of the government's presentation.[7] Kelly was familiar with similar presentations offered by the government in the past, and for a layman was well-versed in the sampling procedures employed such that he didn't feel at the time that an expert would assist his preparation.

In hindsight, Kelly conceded that it might have been helpful to the court to hear another expert point of view, but stated that his belief at the time of sentencing was that "under the facts of this case, and the time and financial limitations . . . placed on [him], that calling an expert at sentencing would [not] have been possible or beneficial." (Kelly Aff. ¶ 17.) Viewed at the time of the alleged error, Kelly's decision to pursue only some of the many avenues available for attacking the government's proof of loss, and his decision to forgo a "battle of the experts," is entitled to a strong presumption of reasonableness that petitioner has not overcome.

Even if the court were to find a deficiency in counsel's performance significant enough to meet the first Strickland prong, petitioner has failed to provide any evidence that he was prejudiced by the lack of expert testimony. Although they criticized the government's sampling, petitioner's

---

[7] Indeed, at sentencing Kelly argued a number of the same points that petitioner's experts bring to the court's attention. For example, Kelly argued that the government's expert had not adequately explained "how the relatively minor change of 25 to 28% of the claims could result in an over 40% difference in the damage calculation." (Sentencing Day 2 Hr'g Tr. 103-04.) Kelly argued that "[t]hat's not the kind of precision that makes this study reliable." (Id. at 104.) He also noted that the government "had the opportunity to make [the sampling] more reliable by doing a larger scope" and that they failed to "explain the differences and irregularities . . . in the results." (Id. at 105.)

8

experts did not themselves run any statistical analysis of a sample or provide a loss amount that would have lessened petitioner's sentence. Indeed, petitioner's experts noted that counting the sixty-five (65) claims with "missing data" called into question the the integrity and validity of the sampling analysis, but by counting these claims as "legitimate," rather than removing them and re-sampling the remaining claims as one of petitioner's expert's suggested, the court decreased the extrapolated amount of loss by almost $3 million. Nothing in petitioner's evidence presentation before the magistrate judge suggested that the method espoused by petitioner's expert, if employed, would have yielded more favorable results.

Petitioner contends that he does not bear the burden of presenting an amount of loss in his motion to vacate, and that "it is impossible to determine if the amount [of loss] would have been substantially lower if [the court had been] given the benefit of expert testimony." (Pet.'s Obj. 11.). But as noted, petitioner does bear the burden of demonstrating a "reasonable probability" that he would have received a more lenient sentence had Kelly utilized those experts' testimony, see Glover, 531 U.S. at 202-04; Strickland, 466 U.S. at 694, and as relevant here petitioner's sentence would have been lowered only by a loss amount less than that found at trial.[8] Petitioner argues that the government may have been required to redo their sampling when faced with expert testimony regarding the integrity of their initial sample, but absent any evidence that this would have resulted in a lower loss amount than found at trial, petitioner has asserted only a "mere possibility," rather than a "reasonable probability," that expert testimony would have lowered his sentence.

---

[8] Petitioner's base offense level would have increased by only 16 levels, as opposed to 18 levels, if the loss amount had been found to be no more than $2,500,000.00. Loss amounts below $1,000,000.00 would have been subject to even smaller base offense level increases. See U.S.S.G. § 2B1.1(b)(1) (2005). Of course, even with a reduced base offense level, the court would have retained the discretion to impose the same sentence ultimately chosen in this case, as that sentence falls below the statutory maximum for petitioner's offenses. See generally Kimbrough v. United States, 552 U.S. 85 (2007); Gall v. United States, 552 U.S. 38 (2007).

In sum, on a *de novo* review of petitioner's fourth claim for relief, the court finds that petitioner has not shown that it was objectively unreasonable for Kelly to have failed to call an expert to challenge the government's sampling, nor has petitioner shown a reasonable probability that he would have received a shorter sentence had an expert testified. Because petitioner has shown neither a deficiency in counsel's performance nor prejudice resulting from any such alleged deficiency, the court denies plaintiff's fourth claim for relief.

3. Petitioner's Fifth Claim for Relief

In his fifth claim for relief, petitioner alleges that Kelly was ineffective at sentencing for failing to advocate for application of the "special rule" governing loss in certain cases involving government benefits, which states:

> In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1 cmt. n. 3(F)(ii) (2005). To succeed on the merits, petitioner must demonstrate that (1) Kelly's failure to invoke the rule was objectively unreasonable and (2) that this failure led to a lengthier sentence. See Glover, 531 U.S. at 202-04; Strickland, 466 U.S. at 687. The magistrate judge recommended denying this claim, relying also on Kelly's representation of his overall sentencing strategy and challenges to the validity of the government's presentation of the amount of loss. Petitioner objects to the magistrate judge's conclusion.

Petitioner argues that the special rule should apply to the calculation of loss in his case because ambulance transport could have been medically necessary even if the patients were not bed-

10

Case 4:04-cr-00027-FL   Document 238   Filed 11/01/10   Page 10 of 14

confined (as claimed by petitioner on the fraudulent Medicare forms). Petitioner notes that Kelly argued at trial that stretcher-bound patients also qualified for ambulance transport under the "medical necessity" rubric, but did not follow up with this argument at sentencing. In other words, petitioner argues that had he not committed the fraud, some of the patients still would have been transported by ambulance and Medicare could have been legitimately billed for this service. Thus, because the sampling supposedly took into account the gross amount of the claims containing fraudulent statements rather than taking into account claims that otherwise would have been medically necessary, the loss was not properly measured as that actually suffered by the government.

It is well-settled that "when determining losses for sentencing purposes, a court must subtract the amount of money or benefits to which a defendant is legitimately entitled from the amount fraudulently claimed." United States v. Miller, 316 F.3d 495, 499 (4th Cir. 2003). It is not clear that one needs the special "government benefits" rule to get to that proposition in this case, or that invocation of the rule would add anything helpful to the court's analysis of the loss in this case.[9] In any event, the argument that the government's loss should be measured by those claims which were not medically necessary, as opposed to those claims which were fraudulent, has merit. However,

---

[9] First, the rule explicitly states that "loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses." U.S.S.G. § 2B1.1 cmt. n. 3(f)(ii) (emphasis added). In other words, "[f]ar from establishing a ceiling on loss under § 2B1.1, . . . the commentary [petitioner] cites instead establishes a floor for that calculation." United States v. Griffith, 584 F.3d 1004, 1018 (10th Cir. 2009). Second, it is not clear that any benefit was actually intended to be given to petitioner in light of the falsified claims. In United States v. Edet, No. 08-10287, 2009 WL 552123 (5th Cir. Mar. 5, 2009) (unpublished) (per curiam), a case involving conspiracy to commit health care fraud, the defendant argued that under the special rule of Application Note 3(F)(ii), the government was required to prove that it paid claims that were not medically necessary in order to include as loss the amount of payments from Medicare. Id. at *2. The Fifth Circuit disagreed, noting that because "the claims [defendant] submitted . . . were fraudulent, the intended benefit was zero, and the district court properly concluded that the loss amount was the total amount that Medicare paid to [defendant] on those claims." Id.; see also U.S.S.G. § 2B1.1 cmt. n. 3(F)(v) (2005) ("In a case involving a scheme in which . . . goods for which regulatory approval by a government agency . . . was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.").

11

petitioner's arguments that the court failed to apply this methodology or that petitioner was prejudiced by Kelly's failure to advocate for that approach are meritless.

Judith Ferguson, the medical fraud investigator who reviewed the two hundred and thirty (230) sample claims, was questioned by Kelly at length about which claims in the government's sample were counted for purposes of calculating loss. Ms. Ferguson testified that she reviewed the claims for "medical necessity and for the ability of the patient to be transported by any means other than ambulance." (Sentencing Day 2 Hr'g Tr. 115.) On cross-examination, Kelly verified that Ms. Ferguson reviewed the claims for "medical necessity" and that she was not "looking for . . or asked to verify instances of fraud." (Id. at 122.) He further elicited that when Ms. Ferguson was evaluating for medical necessity, she would look to see "whether there was some reason that [the patients] . . . needed to have the ambulance transport," and allowed claims where that was the case. (Id. at 121.) She would deny claims where, for example, people were just sitting in a chair and the records "didn't explain that there was any reason why they couldn't travel by other means." (Id.)

Kelly argued that the court should not use this medical necessity analysis in establishing loss, but should instead stick to the specific elements of fraud proven to the jury. He contended that "[t]he raw data was not provided to the defense" and that he had "no way of reviewing the[] patient files, no way of putting on countervailing testimony or evidence about medical necessity." (Sentencing Day 2 Hr'g Tr. 99.) He noted that "it's clear from the testimony that every one of these individuals was looking for, quote, medical necessity . . . [not] fraud or false statements." (Id. at 100.) And he specifically objected to this "overpayment analysis" as irrelevant to the underlying fraud convictions. (Id. at 101.) Even if the court were to use this analysis, Kelly argued, Ms. Ferguson's analysis of "medical necessity" was flawed and subjective. (Sentencing Day 2 Hr'g Tr. 105-06.)

It cannot seriously be contended that petitioner suffered any prejudice from Kelly's failure to advocate for reducing the loss by claims that were otherwise "medically necessary." The loss calculated at trial was actually established by looking to whether the sampled claims were "medically necessary" rather than fraudulent. In other words, petitioner received the benefit of the argument he criticizes counsel for not making. Moreover, Kelly's conduct was not objectively unreasonable in the circumstances presented.[10] As such, petitioner has not shown that his counsel's performance in failing to invoke the special rule of Application Note 3(F)(ii) by name was objectively unreasonable, or that he suffered any prejudice for this failure where the court was operating under the principles embodied in that rule. Accordingly, the court denies plaintiff's fifth claim for relief.

C.  Certificate of Appealability

Under the Federal Rules of Appellate Procedure, a § 2255 movant "cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c)." Fed. R. App. P. 22(b)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). An applicant satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court likewise is debatable. See Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Slack v. McDaniel, 529 U.S. 473, 484 (2000); Rose v. Lee, 252 F.3d 676, 683-84 (4th Cir. 2001).

---

[10] Although Kelly did not advocate using "medical necessity" to calculate the loss attributable to petitioner, he did seek a loss amount based strictly on the fraud proven with regard to the twelve patients named in the indictment, which would have severely limited the loss amount and Kelly's guidelines range. When it became clear the court was going to include the entire scope of the fraud, Kelly challenged the government's review for "medical necessity" as subjective and, as noted, the court counted the sixty-five (65) claims for which no data existed as "medically necessary" thanks in part to Kelly's argument, thereby substantially reducing the loss calculation on other grounds.

13

The certificate of appealability question requires only "an overview of the claims in the habeas petitioner and a general assessment of their merits." Miller-El, 537 U.S. at 336. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims." Id. Indeed, the petitioner need not even prove "that some jurists would grant the petition," so long as he can show that there is room for debate as to the disposition of his claims. Id. at 338. Although the court does not doubt that it properly has denied petitioner's § 2255 motion, it cannot say that there is no room for debate as to the resolution of the fourth and fifth claims for relief.[11] As such, the court grants petitioner a certificate of appealability should he desire to proceed further with these claims before the court of appeals.

## CONCLUSION

For the foregoing reasons, the court ADOPTS as its own the evidentiary findings and conclusions of law of the magistrate judge (DE # 236) and DENIES motion to vacate judgment or set aside sentence pursuant to 28 U.S.C. § 2255 (DE # 197). The court GRANTS petitioner a certificate of appealability. The clerk is directed to enter judgment and close this case.

SO ORDERED, this the 1st day of November, 2010.

LOUISE W. FLANAGAN
Chief United States District Judge

---

[11] Petitioner has waived appellate review of his first three claims by not objecting to the magistrate judge's disposition, see United States v. Midgette, 478 F.3d 616, 621-22 (4th Cir. 2007), and the court need not engage in the certificate of appealability analysis for these claims.

14